**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **REBECCA ROEDER** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 12 C 259 |
| | ) | |
| v. | ) | Magistrate Judge Daniel G. Martin |
| | ) | |
| **CAROLYN COLVIN** | ) | |
| | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Rebecca Roeder ("Plaintiff" or "Roeder") seeks judicial review of a final decision of Defendant Carolyn Colvin, the Commissioner of Social Security ("Commissioner"). The Commissioner denied Plaintiff's application for Supplemental Security Income benefits ("SSI") and disability insurance benefits. Roeder filed a Motion for Summary Judgment that seeks to reverse the Commissioner's decision. The Commissioner subsequently filed a cross motion. The parties have consented to have this Court conduct all proceedings in this case, including an entry of final judgment. 28 U.S.C. § 636(e); N.D. Ill. R. 73.1(c). For the reasons stated below, Plaintiff's motion is granted. The Commissioner's motion is denied.

## I. <u>Legal Standard</u>

### A. The Social Security Administration Standard

In order to qualify for disability benefits, a claimant must demonstrate that he is disabled. An individual does so by showing that he cannot "engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 4243(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. *See* 20 C.F.R. § 404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. § 404.1520(a)(4)(I). It then determines at Step 2 whether the claimant's physical or mental impairment is severe and meets the twelve-month durational requirement noted above. 20 C.F.R. § 404.1520(a)(4)(ii). At Step 3, the SSA compares the impairment (or combination of impairments) found at Step 2 to a list of impairments identified in the regulations ("the Listings"). The specific criteria that must be met to satisfy a Listing are described in Appendix 1 of the regulations. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a Listing, the individual is considered to be disabled, and the analysis concludes; if a Listing is not met, the analysis proceeds to Step 4. 20 C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his exertional and non-exertional capacity to work. The SSA then determines at the fourth step whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id.* If the claimant cannot undertake past work, the SSA proceeds to Step 5 to determine whether a substantial number of jobs exist that the claimant can

perform in light of his RFC, age, education, and work experience.  An individual is not disabled if he can do work that is available under this standard.  20 C.F.R. § 404.1520(a)(4)(v).

### B.  Standard of Review

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court.  Judicial review of an ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent credibility determinations.  *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).  Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions.  *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).  This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review."  *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).  Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence.  *Elder*, 529 F.3d at 413 (citation omitted).

## II.  <u>Background Facts</u>

### A.    Medical History

In January 2006, Roeder was sitting in her car when another vehicle traveling at 40 miles per hour hit her from behind. (R. 312). The driver responsible for the accident was not significantly injured, though he later died in a separate automobile accident. Roeder was taken to the emergency room at North Shore Medical Center, where an x-ray showed normal alignment of the spine with some signs of spasm. (R. 199). She was released after being prescribed Motrin and Vicodin for pain relief.

Roeder followed up one month later with neurologist Dr. Hien Dang. Her complaints were largely consistent with those made at the hearing – head pain from the neck up, poor sleep, neck and back pain, and problems with concentration. (R. 201). Dr. Dang noted lumbar and cervical sprains, as well as post-traumatic headaches. (R. 202). He prescribed more Vicodin, as well as the muscle relaxant methocarbanol. Dr. Dang also ordered a brain MRI for Roeder. The MRI showed only small "patchy" areas in the cerebellum that were consistent with vascular-pattern headaches. (R. 212). An MRI of the lumbar spine was also unremarkable except for a mild curvature. (R. 211). An EEG study ordered by Dr. Dang revealed a left lumbar radiculopathy at the L5 level. (R. 205).

Despite these unremarkable studies, Roeder continued to experience pain and to seek relief from it. She began treatment with chiropractor Christopher Szpila shortly after her accident. Roeder also consulted pain specialist Dr. John O'Hara, who injected her with nerve blocks and prescribed two medications that are not legible from the record. (R. 215). The record is unclear, but Roeder appears to have seen Dr. O'Hara at least through July 2007 for her pain. (R. 214). In September 2007, she consulted with neurologist Dr. Neil Allen. Dr. Allen agreed with the earlier diagnosis of cervical and lumbar strains, but he also believed that Roeder had myofascial pain syndrome. Dr. Allen recommended that she

4

start on Lyrica, which is used to treat fibromyalgia, and a low dose of the antidepressant Elavil for sleep. (R. 273). A formal diagnosis of fibromyalgia was made in November 2007 by a physician whose name is illegible. (R. 277).

Roeder began physical therapy at Lake County Physical Therapy LLC shortly after this diagnosis was made. (R. 278-79). The record does not indicate what treatment she may have received in 2008. In January 2009, however, Roeder consulted rheumatologist Dr. David Mael. Dr. Mael confirmed that she had tenderness at all 18 of the test points used to diagnose fibromyalgia, as well as significant signs of depression. He urged Roeder to take Cymbalta to decrease her pain. When she refused, Dr. Mael increased her dosage of Lyrica and added the pain reliever Tramadol three times a day. (R. 312-14). Three months later, Dr. Mael added Vicodin to her medication regime. (R. 363). Roeder attempted to deal with her depression by seeking counseling with Certified Mental Health Professional Elaine Beisito. The treatment sessions ended in August 2009, when Roeder claimed that she had no money and was in too much pain to continue with counselling. (R. 418).

### B.   Examining and State Agency Physician Reports

Seven reports by examining and state agency physicians were submitted to the ALJ in this case. Dr. Scott Kale provided a report to the state disability office concerning his February 12, 2009 examination of Roeder. Dr. Kale diagnosed her with posttraumatic fibromyalgia, fatigue, non-restorative sleep, and a "markedly" weak cervical spine that suggested a possible cervical myelopathy. (R. 317). Dr. Darrell Snyder issued a Psychiatric Review Technique ("PRT") for the SSA later the same month. Dr. Snyder found that Roeder suffered from a non-severe form of depression. (R. 319, 322). He

found no evidence of an episode of decompensation and only mild restrictions in Roeder's activities of daily living, social functioning, and concentration. (R. 329).

On March 4, 2009, state agency physician Dr. Charles Kenney issued a physical RFC for Roeder. He found that she could lift 20 pounds occasionally, and up to 10 pounds frequently. She could sit and stand for six hours in an eight-hour workday and had an unlimited ability to push and pull. (R. 356). Internal medicine specialist Dr. Jeffrey Ryan then examined Roeder in June 2009 and issued a report for the state disability office. Dr. Ryan noted that Roeder weighed only 85 pounds. He concluded that she had fibromyalgia and a depressed mood. (R. 375-76). Dr. Patricia Morrin then submitted a mental status report after examining Roeder on July 20, 2009. Dr. Morrin found her to be moderately depressed, with diagnoses of cannabis abuse, dysthymic disorder, and nicotine dependence. (R. 388-89).

In August 2009, Dr. Carl Hermsmeyer submitted a new PRT that found a non-severe dysthymic disorder and a substance abuse disorder. His mental RFC, however, was more limiting than the earlier RFC issued by Dr. Snyder. Dr. Hermsmeyer found that Roeder suffered from a mild limitation in her activities of daily living, but she had moderate restrictions in her social functioning and concentration, persistence, and pace. (R. 400).

Finally, Dr. Michael Stone submitted a mental disorder report on behalf after Roeder after examining her in May 2010. Roeder had consulted Dr. Stone in October 2009. The notes from that consultation are part of the record. Dr. Stone concluded that Roeder suffered from chronic pain, depression, memory problems, and "agitation" that imposed "marked" restrictions on her activities of daily living, social functioning, and concentration. He also found that she would frequently be unable to complete tasks and could not carry

out work duties on a sustained basis.  (R. 479-82).

### C.    Hearing Testimony

Roeder appeared at a hearing before ALJ Brooks on July 27, 2010.  Her testimony was elicited in large part by her attorney because the ALJ made no meaningful inquiries concerning Roeder's medical condition, her claimed limitations, or her activities of daily living.  Instead, the ALJ focused primarily on Roeder's work history and a pending lawsuit concerning the automobile accident that initiated her alleged disability.  Roeder testified that she worked as a nanny after her accident from June 2006 through June or July 2007.  Her wages were $200 a week, though Roeder did not state how often she worked each month, or what her monthly or annual salary was.  (R. 39-40).  She also stated that she rejected two offers of $20,000 and $70,000 to settle her lawsuit because a mediator had assessed its value at $185,000.  (R. 54-56).

Roeder described her pain as shooting from her neck down through her arms and hands.  She also experiences pain in her legs and lower back.  (R. 40).  Physical therapy was helpful, but the injections she received to control the pain were not effective.  (R. 41, 44).  Roeder stated that she had become increasingly forgetful and fatigued.  (R. 42).  The Lyrica and Tramadol given to treat her fibromyalgia were not helpful.  Fatigue requires Roeder to lie down throughout the day.  (R. 51-52).  Sleep is very difficult for her.  (R. 42).  She can only do small loads of laundry and has difficulty in completing most tasks.  (R. 42, 47).  Cooking, cleaning, and even eating are also problematic.  (R. 48).  Roeder, who is five feet tall, stated that she had lost up to 15 pounds since her accident and weighed only 86 pounds at one point.  (R. 50-51).

Roeder also testified that she had become depressed following her accident.  She

sought treatment for anxiety with a therapist at the Turning Point counseling center and also consulted psychologist Dr. Stone. However, Roeder lost all insurance coverage in 2007 and did not have the money to pursue further treatment. (R. 46-48).

### D. The ALJ's Decision

ALJ Allyn Brooks issued a written decision on August 9, 2010 that found Roeder to be not disabled. The ALJ did not find that Roeder had engaged in substantial gainful activity at Step 1, though the ALJ noted that Plaintiff had worked as a waitress from June 2006 through 2007 at wages below the regulatory threshold for "gainful activity." At Step 2, Roeder's severe impairments were identified as "status post motor vehicle accident in 2006, with residual cervical and lumbar sprain," fibromyalgia, post-traumatic stress, and depression.[1] Roeder's depression was not found to meet or medically equal a Listing at Step 3.

Before moving to Step 4, the ALJ found that Roeder had exaggerated her pain. The ALJ made no other specific credibility assessment, though he appears to have determined that Plaintiff was largely non-credible. Roeder's RFC was found to be a full range of sedentary work, with the ability to understand and carry out simple instructions. Roeder could not perform her past relevant work at Step 4. At Step 5, the ALJ determined that a significant number of jobs were available for Roeder and, as a result, concluded that

---

[1] It is not clear what the ALJ meant by "post-traumatic stress." Neither the record nor the ALJ's decision supports a finding of post-traumatic stress syndrome. The ALJ may have meant this phrase to refer to Dr. Dang's diagnosis of post-traumatic headaches. (R. 202). The record also contains findings of post-traumatic myofascial pain syndrome, (R. 277), and post-traumatic fibromyalgia. (R. 317). The ALJ's decision does not mention any of these diagnoses. The ALJ shall clarify on remand what post-traumatic stress includes and the RFC restrictions, if any, that stem from it.

Roeder was not disabled.

### III.  Discussion

Roeder contests the ALJ's decision on five grounds.  She claims that the ALJ erred because he: (1) failed to consider all of her fibromyalgia symptoms; (2) overlooked key medical evidence; (3) improperly assessed her credibility; (4) incorrectly determined the RFC; and, (5) failed to call a vocational expert ("VE") to testify.[2]

### A.     Fibromyalgia and the Medical Evidence

Roeder first claims that the ALJ overlooked a range of symptoms related to her fibromyalgia, including fatigue, difficulty in concentration, and insomnia.  The ALJ did not consider Roeder's fibromyalgia in any detail.  The Commissioner claims that the ALJ's account is acceptable as it currently stands because the ALJ's credibility assessment discussed symptoms like pain and fatigue.  According to the Commissioner, that sufficiently accounts for Roeder's fibromyalgia complaints.

The Court does not reach the merits of Roeder's fibromyalgia claim because this case requires remand on other grounds.  Instead, the ALJ is instructed to analyze this issue in light of the SSA's July 15, 2012 Ruling concerning fibromyalgia, SSR 12-2p.  The ALJ did not have the benefit of this Ruling when he issued his decision.  SSR 12-2p makes clear that an ALJ must consider the fact that fibromyalgia symptoms can wax and wane and that certain limitations may be present that would erode a claimant's occupational

---

[2]    In light of the errors discussed below, the Court does not reach Roeder's argument on whether the ALJ should have called a VE to testify at the hearing.  The ALJ will be required to reconsider substantial parts of the record and Roeder's testimony on remand.  The decision as to whether a VE is necessary is best left to the ALJ's considered judgment in light of the facts that emerge from this additional evidence.

base. The Ruling also points out that, although fibromyalgia is not a listed impairment, an ALJ must determine if it medically equals another impairment such as inflammatory arthritis. The ALJ will have the opportunity on remand to reconsider any part of Roeder's fibromyalgia that requires further assessment under SSR 12-2p.

Roeder also argues as part of this issue that the ALJ failed to properly account for the medical record. The Court also declines to remand on this issue because the errors discussed below already require the ALJ to consider the evidence more fully. That said, the Court has serious concerns regarding the ALJ's consideration of the record that was presented in this case. Much of the record was not discussed at all. The ALJ overlooked records from Roeder's rheumatologist Dr. Mael and failed to note Plaintiff's psychotherapy with Elaine Beisito. Only two of the seven examining and state agency physician reports discussed above were cited in the ALJ's decision. No support for the physical RFC was given at all. The ALJ also mistakenly concluded that Roeder had worked as a waitress after her alleged onset date. In reality, Roeder only worked as a waitress up to the time she was injured in January 2006.

The ALJ may have overlooked some parts of the medical record because they post-dated the expiration of Roeder's insurance disability period in September 2007. However, that does not necessarily justify the exclusion of all medical evidence after the last date insured. An ALJ must consider all of the record, "including the evidence regarding the plaintiff's condition at present." *Parker v. Astrue*, 597 F.3d 920, 925 (7th Cir. 2010). *See also Halsvorsen v. Heckler*, 743 F.2d 1221, 1225 (7th Cir. 1984) ("There can be no doubt that medical evidence from a time subsequent to a certain period is relevant to a determination of a claimant's condition during that period."). Evidence after September

10

2007 is especially important in this case because Roeder's fibromyalgia, which the ALJ found to be severe at Step 2, was itself first diagnosed after that date. (R. 277). The ALJ could not find fibromyalgia to be a severe impairment and then overlook records from Roeder's treating rheumatologist on her condition.

### B. The Assessment of Dr. Stone

An ALJ is required to evaluate every medical opinion in the record. 20 C.F.R. § 404.1527(d). *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) ("Weighing conflicting evidence from medical experts . . . is exactly what the ALJ is required to do."). The regulations lay out six factors an ALJ should consider as part of this analysis, including the nature and length of the treatment relationship, the medical expert's specialization, and the degree to which a source's opinion is supported by other evidence. 20 C.F.R. § 404.1527(d)(1)-(6). The ALJ must clearly state the weight he has given to the medical sources and the reasons that support the decision. *See Ridinger v. Astrue*, 589 F. Supp.2d 995, 1006 (N.D. Ill. 2008).

Roeder claims that the ALJ's assignment of "little" weight to the opinion of Dr. Stone fails to meet this standard. Roeder met with Dr. Michael Stone in October 2009, and he issued a Mental Disorders Report in May 2010 that imposed serious restrictions on Plaintiff's functional capacity. The ALJ gave Dr. Stone's report little weight because Roeder only met with him one time after the last date insured, and because it was not based "on objective medical findings." (R. 25).

The Court agrees that the ALJ's assessment is flawed, but on different grounds from those Roeder presents. Plaintiff argues that the ALJ should have given the report

11

controlling weight because Dr. Stone was her treating psychiatrist. *See* 20 C.F.R. §

4041527(d)(2) (directing an ALJ to give controlling weight to a treating source whose

opinion is well-supported by the record). That is not the case. Dr. Stone (who appears to

be a psychologist, not a psychiatrist) did not have an ongoing treatment relationship with

Roeder.[3] (R. 480). A psychologist who only sees a claimant for one session is considered

an "acceptable medical source" who is not subject to the treating physician rule. *See* 20

C.F.R. § 404.1502; *White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005).

An ALJ must still weigh the opinion of an acceptable medical source by applying all

the criteria required by the regulations. Several acceptable medical sources are present

in the record, though the ALJ only weighed Dr. Stone's report. One of the ALJ's bases for

doing so was that Dr. Stone's findings were not based on "objective medical findings." (R.

25). It is entirely unclear what the ALJ meant by this statement. Dr. Stone interviewed

Roeder, as a clinical psychologist would ordinarily do in order to assess a patient's

depression. Twelve pages of interview notes accompany the psychologist's report. Such

mental status examinations based on personal interviews are routinely used in cases of

this type.[4] Insofar as the ALJ believed that other evidence was required, he was obligated

to explain what was lacking and to build a logical bridge between the absence of such

evidence and the weight given to Dr. Stone. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir.

---

[3] A psychologist "is deemed to be a 'physician' in the sense of a medical expert with
relevant expertise who treats the applicant[.]" *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir.
2008) (citing 20 C.F.R. § 404.1513(a)).

[4] Dr. Morrin used the same interview method when she evaluated Roeder's mental
condition for the state disability agency. (R. 384-89). The ALJ did not consider Dr.
Morrin's opinion. If he had done so, however, the same logic would have required him to
find that the state agency's own expert report was not based on objective findings.

2009).  Merely invoking the absence of unspecified "objective medical findings" does not allow the Court to follow the basis of the ALJ's reasoning.

The Commissioner defends the ALJ's assessment of Dr. Stone by noting that his report conflicts with other mental status exams, including Dr. Hermsmeyer's PRT.  This argument faces strong headwinds that the Commissioner does not address.  The ALJ himself did not rely on a conflict in the record to support the weight he gave to Dr. Stone.  Courts cannot supply reasons the ALJ did not cite, even if substantial evidence in other parts of the record supports the ALJ's finding.  *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002); *Baker v. Barnhart*, 410 F. Supp.2d 757, 766 (E.D. Wis. 2005).  Neither the Court nor the Commissioner can rely on reports from Dr. Snyder, Dr. Morrin, or Dr. Ryan to justify the ALJ's decision because the ALJ never cited these physicians in his decision.

The Commissioner is correct that Dr. Hermsmeyer's PRT conflicts with Dr. Stone's report.  But the ALJ did not rely on Dr. Hermsmeyer to discount Dr. Stone.  He only used Dr. Hermsmeyer to support the RFC assessment.  (R. 25).  Even if the ALJ had relied on Dr. Hermsmeyer, he failed to explain why that justified the weight given to Dr. Stone.  The ALJ discounted Dr. Stone, in part, because he only treated Plaintiff one time.  However, Dr. Hermsmeyer – who was clearly given greater weight then Dr. Stone – did not examine Roeder at all.  An ALJ is ordinarily required to give more consideration to a medical source who has treated a claimant than to one who has not.  20 C.F.R. § 404.1527(d)(1).  *See also Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) (stating that a contradictory opinion of a non-examining physician is not sufficient, standing alone, to reject an examining source); *Criner v. Barnhart*, 208 F. Supp.2d 937, 954 (N.D. Ill. 2002) ("The

opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician") (internal quote and citation omitted); *Simms v. Astrue*, 599 F. Supp.2d 988, 1002 (N.D. Ind. 2009).

The Court agrees with the Commissioner that Dr. Stone's report presents a more pessimistic view of Roeder's functional capacities than the results of the other mental status exams. The ALJ may have good reason on remand for reaching the same result that he found here. However, the ALJ must follow the regulatory guidelines for weighing a medical source, must take the conflicting reports into consideration, and must discuss the reasons for the weight assigned. Plaintiff's motion is granted on this issue.

### C.    The Credibility Issue

If an ALJ finds that a medical impairment exists that could be expected to produce a claimant's alleged condition, he must then assess how the individual's symptoms affect his ability to work. SSR 96-7p. The fact that a claimant's subjective complaints are not fully substantiated by the record is not a sufficient reason to find that he is not credible. Instead, the ALJ must consider the entire record and "build an accurate and logical bridge from the evidence to his conclusion." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). Factors that should be considered include the objective medical evidence, the claimant's daily activities, allegations of pain, any aggravating factors, the types of treatment received, any medications taken, and functional limitations. *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006); *see also* 20 C.F.R. § 404.1529(c)(3); SSR 96-7p. A court reviews an ALJ's credibility decision with deference because "the ALJ is in the best position to

14

determine the credibility of witnesses." *Craft*, 539 F.3d at 678.

The ALJ appears to have found Roeder not to be credible at all, though his only explicit assessment was that Plaintiff had "exaggerated" her pain. (R. 24). In support, the ALJ relied heavily on a conclusion that Roeder had returned to work as a waitress for a full year following her automobile accident. The ALJ mentioned that allegation three times and found it to be evidence that Roeder could perform sedentary work. (R. 24-25). Roeder actually testified that she worked as a nanny, not as a waitress, from June 2006 through June or July 2007. The Commissioner contends that it does not matter whether Roeder worked as a nanny or as a waitress. Citing *Williams-Overstreet v. Astrue*, 364 Fed.Appx. 271 (7th Cir. 2010), the Commissioner states that the only relevant point is that she worked after her injury.

A claimant's ability to work can raise serious doubts about her disability allegations. That does not mean, however, that work of any kind automatically requires a finding that a claimant is not credible. A more nuanced view is required. There must be at least some evidence showing what work Roeder did, the exertion level it required, and the frequency of her work. The Commissioner's reliance on *Williams-Overstreet* does not suggest otherwise. In that case, the claimant worked part-time four days a week, six hours a day, transporting passengers at an airport terminal in a golf car or a wheelchair. *Id*. at 277. The VE testified that this constituted work at the "medium" exertional level, which supported a finding that the claimant could perform sedentary work. *Id.*

No equivalent evidence is available in this case. Setting aside the fact that the ALJ misunderstood the work Roeder actually did, he also failed to elicit the testimony needed to support his credibility inference. Moreover, the ALJ cited nothing in the record showing

15

what Roeder did as a nanny, how many hours she worked each week, or whether her work was full-time, part-time, or sporadic. The ALJ relied on a conclusion that Roeder earned $800 a month, implying that she worked on a sustained basis each month from 2006 to 2007. But Roeder only stated that she earned $200 a week. She may have worked only a few days a week. She may also have only worked one or two weeks a month, or not at all for periods of time. The Court notes that Plaintiff's income sheet states that she had no income for calendar year 2007, and earned only $1,268.70 in 2006. (R. 109). This is not evidence that Roeder earned $800 a month from June 2006 to June 2007, or that she worked on a sustained basis. Without asking about the tasks and hours Roeder actually undertook as a nanny, the ALJ failed to explain why her past work was a ground for discounting her testimony on this point.

The ALJ also relied on the fact that Roeder had turned down offers of $20,000 and $70,000 to settle her personal injury suit. He concluded that "[i]t is evident that the claimant has an incentive to continue being treated and not to work." (R. 24). The Commissioner states that the Seventh Circuit's decision in *Edwards v. Sullivan*, 985 F.2d 334 (7th Cir. 1993) implicitly approves of an ALJ's reliance on a lawsuit to reach such a conclusion. This overstates the extent of *Edwards*' discussion. The Seventh Circuit upheld an ALJ's adverse credibility decision that depended, in part, on the fact that the claimant in that case was pursuing a personal injury action. However, the ALJ's decision was also based on a range of other factors that undermined the claimant's subjective allegations. *Edwards* did not single out the pending personal injury suit as a justification for the ALJ's decision. *Id*. at 338.

The Commissioner overlooks in this regard that many courts have firmly rejected

16

an ALJ's reliance on personal injury suits as basis for discounting a claimant's credibility. *See*, *e.g.*, *Fortier v. Astrue*, No. 3:10-cv-1688, 2012 WL 3727178, at *11 (D. Conn. May 11, 2012); *Foster v. Astrue*, No. 3:08-cv-960, 2009 WL 4757239, at *6-7 (M.D. Fla. Dec. 10, 2009); *Aronis v. Barnhart*, No. 02-cv-7660, 2003 WL 22953167, at *7 (S.D.N.Y. Dec. 15, 2003). At a minimum, the ALJ was required to explain why Roeder's suit undermined her credibility instead of citing the fact that she filed a personal injury suit. It is undisputed that Roeder was looking for money to treat her pain. The reason is not difficult to find in the record: Roeder stated that she lost her health insurance in 2007. The ALJ overlooked that issue entirely. On remand, the ALJ shall explain more carefully how he reached this conclusion and what evidence supports a finding that Roeder exaggerated her pain.

Roeder's lawsuit and her alleged work as a waitress were the only specific reasons the ALJ cited for the credibility assessment. The Commissioner notes that the ALJ also considered Roeder's activities of daily living. In reality, the ALJ did not so much discuss these activities as he merely cited the conclusions of Dr. Hermsmeyer, who did not examine Roeder. That may be because the ALJ never asked Plaintiff any questions at the hearing about her activities, her functional limitations, or the symptoms of her impairments. Nor did the ALJ cite what Plaintiff actually said at the hearing in response to her attorney's questions on these topics. If the ALJ intended to rely on Roeder's daily activities as a basis for her credibility, he should have questioned her directly, or at least taken account of her testimony. That is, after all, one of the purposes of holding a non-adversarial hearing before a social security ALJ. *See Moran v. Astrue*, 569 F.3d 108, 112 (9th Cir. 2009); *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999).

Equally important, the ALJ failed to consider the accuracy of what Dr. Hermsmeyer

17

stated on this topic. Dr. Hermsmeyer's account of Roeder's activities appears to be based on the self-reported activities that Plaintiff submitted to the SSA. (R. 402, 139-45). The problem is that Dr. Hermsmeyer's version of Roeder's activities does not fully reflect what she stated in the SSA reports.[5] Plaintiff did state that she could drive a car, but she also claimed that friends have to drive her places. She can do household chores, but only when she moves slowly. She can go out of the house, as Dr. Hermsmeyer indicated, but only once a day. These statements strongly suggest qualifications on Roeder's activities that neither Dr. Hermsmeyer nor the ALJ considered. On remand, the ALJ should account for what Plaintiff testified to about her daily activities and explain with greater care how they support the credibility assessment. Plaintiff's motion is granted on this issue.

**D. The RFC Issue**

Finally, Roeder argues that substantial evidence does not support the RFC assessment of sedentary work because he overlooked key parts of the medical record. As the Court noted earlier, the ALJ failed to consider large portions of the record. The result is that the ALJ did not provide any discussion of how he reached the RFC. Social Security Ruling 96-8p requires ALJs to provide "a narrative discussion describing how the evidence supports each [RFC] conclusion" and must also address the medical source opinions. Especially important in this case was Dr. Charles Kenney's physical RFC, which found that Roeder was able to carry out light work. *See* 20 C.F.R. § 404.1567(b) (describing the requirements for light work). The ALJ never discussed this finding and did

---

[5] The Court's concerns about the accuracy of Dr. Hermsmeyer's account of the record is deepened by the fact that he appears to have believed that Roeder (who is female) was a man. *See* Record at 406 (repeatedly referring to Roeder as "he").

not rely on it in reaching his own RFC. He also failed to ask Roeder about any of her exertional or non-exertional limitations at the hearing.

The only part of the medical record that the ALJ cited was a generalized reference to documents from the Brain Medical Center. The ALJ believed these documents indicated that Roeder had "no limitations on lifting, sitting and standing." (R. 24). That explains nothing about why Roeder should be limited to sedentary work. If Roeder had an *unlimited* ability to sit, stand, and lift then she could presumably perform sedentary, light, medium, heavy, or even very heavy work under the regulations. *See* 20 C.F.R. § 404.1567. The ALJ's task was to explain what evidence supported his finding that Roeder actually had limitations in all of these exertional areas. As it stands, the Court cannot follow the logic of the ALJ's reasoning on this issue.

The result is that the ALJ did what he was not allowed to do – fashion his own RFC without supporting evidence. Social Security Ruling 96-8p requires an ALJ to explain how he arrived at the RFC assessment and to describe the evidence that supports its conclusions. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352-53 (7th Cir. 2005); SSR 96-8p. This requires a thorough examination of both medical and non-medical evidence. 20 C.F.R. § 404.1545. What an ALJ cannot do is fashion a "middle ground" RFC without a proper basis. *Bailey v. Barnhart*, 473 F. Supp.2d 822, 838-39 (N.D. Ill. 2006); *Norris v. Astrue*, 776 F. Supp.2d 616, 637 (N.D. Ill. 2011). That is what took place here. On remand, the ALJ shall explain how the record supports the RFC assessment.

Roeder objects to the ALJ's finding that her mental limitations could be accommodated by performing only "simple" tasks. The Court agrees, albeit on slightly different grounds. An ALJ can fashion an appropriate mental RFC that assigns "simple"

19

tasks to a claimant. *See Warner v. Astrue*, 880 F. Supp.2d 935, 944 (N.D. Ill. 2012). If he does so, however, he cannot rely on a phrase like "simple tasks" to account for all of a claimant's mental restrictions" unless the record shows that a doctor used [such] particular descriptive language to describe what work a claimant can perform in spite of his limitations[.]" *Conley v. Astrue*, 692 F. Supp.2d 1004, 1009 (C.D. Ill. 2010). *See also Lichtsinn v. Astrue*, 683 F. Supp.2d 811, 821-22 (N.D. Ind. 2010).

The ALJ tried to meet this requirement by referencing Dr. Hermsmeyer's conclusion that Roeder could perform "simple one- and two-step tasks at a consistent pace." (R. 25, 406). The Commissioner claims that Dr. Hermsmeyer's statement, together with Dr. Morrin's analysis, sufficiently supports the ALJ's mental RFC. Unfortunately, that is not the case. The ALJ never cited Dr. Morrin, and the Commissioner cannot rely on evidence the ALJ did not consider. As for Dr. Hermsmeyer, his conclusion concerning Roeder was based on findings that the ALJ did not adopt in their entirety. Dr. Hermsmeyer found that Roeder's depression was not severe; the ALJ concluded it was severe. (R. 390). Dr. Hermsmeyer believed that Roeder had "moderate" limitations in her social functioning; the ALJ's special technique analysis at Step 2 found the restriction to be "mild." (R. 400). Dr. Hermsmeyer also found that Roeder had a substance addiction disorder; the ALJ did not. (R. 390).

These discrepancies are not large in themselves, but it is clear that the ALJ did not adopt Dr. Hermsmeyer's opinion completely. The ALJ presumably believed that other reasons existed for finding that Roeder was less limited in her social functioning, but that her depression was more severe than Dr. Hermsmeyer believed. However, the ALJ gave no explanation as to what those reasons were. As this case requires remand on other

grounds, the ALJ shall clarify what evidence supports his special technique conclusions and how the fact that Roeder can perform simple tasks accounts for the limitations that are found by applying that technique.  Plaintiff's motion is granted on the RFC issue.

### IV.  <u>Conclusion</u>

For the reasons stated above, Plaintiff's motion for summary judgment [11] is granted.  The Commissioner's motion [23] is denied.  This case is remanded to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.  It is so ordered.

**ENTERED:**

_Daniel G. Martin_
_____
**DANIEL G. MARTIN**
**United States Magistrate Judge**

Dated: July 2, 2013